[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The petitioner-mother Aubrey B. has filed a petition for termination of parental rights with respect to the minor child Samantha B. seeking to terminate the parental rights of the respondent-father Danny H.. The petition was filed in the Shelton Probate Court on March 3, 1997, pursuant to C.G.S. 45a-715, and was transferred to the Superior Court Juvenile Matters at Bridgeport, on June 13, 1997, pursuant to C.G.S. 45a-715(g).
The grounds alleged in the petition are that the respondent has abandoned the minor child, and that at the time the petition was filed, no ongoing parent-child relationship existed between the respondent and the child. The petition further alleges that to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interest of the child pursuant to statute.
 PROCEDURAL HISTORY
Trial on the termination petition was commenced on November 19, 1997, and was continued to various dates for trial until April 15, 1998 when testimony concluded. The Court ordered the parties to file legal briefs by May 11, 1998. The period of reserved decision commenced on May 12, 1998. CT Page 10303
The petitioner and the respondent were present on each day of the trial and they were each represented by legal counsel. The minor child was represented by legal counsel as well.
The petitioner introduced the testimony of the following witnesses:
 1. The petitioner, Aubrey B.; 2. Kathleen B., maternal grandmother; 3. Dr. Herbert Sacks, M.D., psychiatrist; 4. Catherine Bennett, DCF social worker; 5. Danny H., respondent — father;
The respondent introduced the following witnesses:
 1. Aubrey B., petitioner-mother; 2. Ronald B., maternal grandfather, 3. Geraldine H., paternal grandmother, 4. Danny H., respondent-father; 5. George Temple, Esq., respondent's former attorney.
 No evidence or testimony was introduced by the counsel for the minor child.
 FINDINGS OF FACT
The Court, having carefully considered the testimony of the witnesses and the evidence adduced at trial, including the exhibits, makes the following findings of fact:
The petitioner, who is presently 24 years old, and the respondent commenced dating in January, 1993. In April, 1993, the petitioner discovered that she was pregnant. The petitioner gave birth to the minor child Samantha B. on February 25, 1994. The respondent father was present at the birth. By the time of the birth, the parties were no longer maintaining a relationship with each other. The petitioner-mother indicated that she would allow the respondent to see the child, if he would refrain from alcohol and marijuana abuse, and would either go to school or be gainfully employed. However, despite the respondent's requests to visit with the child, shortly after its birth, the petitioner and her parents refused to allow the petitioner access to their home to visit the child. Additionally the petitioner refused to take the child to the respondent's parents' home to allow visitation, due to her stated concerns that the respondent's family were CT Page 10304 cigarette smokers. The petitioner and her father both testified that the respondent was not allowed in the home of the petitioner's parents, as they disapproved of his past involvement with the police.
On or about, March 20, 1994, the petitioner informed the respondent that he would need to go to court in order to get any visitation with the minor child Samantha B.. It is noted that in the month since the child's birth, the father had contributed the sum of $100.00 to the child's support, and the respondent had presented the petitioner with a doll for the child. Attempts by the respondent's family members to deliver other gifts for the child were rebuffed by the petitioner and her parents.
On May 18, 1994, the respondent-father filed an action for visitation rights in the Superior Court Judicial District Ansonia-Milford at Milford. On September 26, 1994, the Court acting by the Hon. Judge Coppeto, ordered that the respondent be allowed two hours of supervised visitation with the minor child. The respondent did visit with the minor child in October, 1994 when the child was approximately eight months old. A second anticipated visit was never scheduled as the respondent was arrested and incarcerated for a short period of time. Prior to his arrest the respondent, as well as, the petitioner agreed to be evaluated by a psychiatrist, Dr. Herbert Sacks, but the respondent subsequently missed three scheduled appointments, citing a conflicting work schedule and a lack of transportation to Dr. Sacks office. It is noted that the respondent was not incarcerated when these appointments were canceled. Dr. Sacks was able to interview and evaluate the petitioner, the minor child and the maternal grandparents.
Upon the petitioner's release from his short incarceration in late 194, he did not continue to pursue his visitation action in Court. On December 9, 1995, the Milford Superior Court dismissed his action for dormancy status. The respondent took no further action, legal or otherwise to visit the minor child until January, 1997. Despite sporadic employment as a roofer and in snow plowing from late 1994 until the summer of 1996; the respondent offered no financial support for his child, nor did he attempt to contact his child. There was no credible evidence that the respondent attempted to deliver any gifts, letters or cards to the child. His family members did attempt to deliver Christmas gifts for the child in December, 1994, but were unsuccessful. CT Page 10305
The respondent admits that between the end of 1994 and his subsequent incarceration in July, 1996, he earned approximately $200.00 per week, and spent sums of money for drugs during that period of time. Additionally, the respondent claimed he could not afford legal representation to pursue his visitation rights, while spending money for drugs and other forms of recreation. The respondent claims he was unaware that he could represent himself in Court, despite being informed by the Court-appointed Guardian Ad Litem for the child on January 3, 1995, that he should file a pro se appearance, due to the withdrawal of Atty. Temple as his attorney.
The respondent was incarcerated again in July, 1996, on drug related charges, and in January, 1997, he filed a second motion for visitation, this time in the Superior Court Judicial District of Tolland at Rockville. At the time that action was filed, Samantha B. was 2 years, months old. The respondent had only seen his child for a short time at birth and for twenty minutes at his visitation in October, 1994.
Meanwhile, the petitioner and the child had been continuously residing with the maternal grandparents at the grandparents' home. The grandparents had been financially supporting them with no assistance or contribution from the respondent, other than one $100.00 contribution. The petitioner had re-enrolled in college to pursue her degree. The petitioner also worked at part time jobs to supplement her income. Child care was provided by the family and sitters while the petitioner went to college classes and worked. The maternal grandparents paid for the medical expenses of the child and all legal fees associated with the visitation actions brought by the respondent. They also paid for the evaluations by Dr. Sacks and the services of the Guardian Ad Litem, despite the obligation by agreement with the respondent to share these costs for Dr. Sacks and the Guardian Ad Litem.
Prior to any action being taken, the Superior Court at Rockville transferred the second visitation action filed by the respondent, to the Superior Court in Milford, on March 24, 1997. The pending petition for termination of parental rights was filed at the Shelton Probate Court on March 3, 1997. It was then transferred to the Superior Court Juvenile Matters at Bridgeport on June 13, 1998. The respondent was assigned legal counsel by the Court at no cost to himself, as a result of his financial inability to engage private legal counsel, due to his status since July, 1996 as an incarcerated prisoner. During the pendency CT Page 10306 of the trial, the respondent was released from incarceration.
During the course of the trial the Court heard testimony from Dr. Herbert Sacks, a psychiatrist with a private practice in Wesport, Connecticut, who is affiliated with the Yale University Child Study Center. Dr. Sacks, a past President of the American Psychiatric Association, was qualified as an expert witness with no objection from the respondent or his counsel. Dr. Sacks testified that the minor child Samantha Bhd. superior intelligence and was a well-adjusted, developmentally sound child. He further testified that the child was not aware of her biological father and had no on-going relationship with the respondent. In Dr. Sacks' opinion the likelihood of harm to Samantha B. is great if the respondent were to be introduced into her life at this time. He further testified that the child is not old enough to realize that she is being deprived of any relationship with the respondent; especially because she does not know of his existence. Dr. Sacks stated that the mother is the only psychological parent of the child, and that the child is well adjusted and surrounded by a loving family, who offer her the necessary support emotionally, physically and financially.
The Court also heard testimony from Catherine Bennett, social worker for the Department of Children and Families, who conducted a Court-ordered study for this matter. In the course of conducting her study she interviewed the parties, family members and the gentleman to whom the petitioner is engaged to be married. The petitioner and her fiance indicated that should the termination of parental rights be granted, they intend to pursue a step parent adoption in the near future.
Ms. Bennett interviewed the respondent by telephone due to his incarceration. The respondent admitted that he did not pursue visitation with Samantha B. while he was incarcerated because he did not want her to know he was in jail, and he would not want her to come to the jail for visits. He also admitted that the child was a stranger to him. He indicated that his reasons for filing a second visitation action in January, 1997, was because he now had access to free legal services as a prisoner. The respondent conceded that he had no relationship with his daughter, but that "she has a right to know me." He admitted that he had not provided any financial support except for $100.00 shortly after birth. He did claim to have mailed cards and letters to the child, but claims that the petitioner and her family refused to accept them. He offered no physical proof then, CT Page 10307 or at the trial that cards and letters were mailed and returned to him. He claims that he was continually thwarted by the petitioner and her family from making contact with Samantha B.. He maintained the position that it was financially impossible for him to pursue visitation in Court prior to his incarceration in July, 1996.
Ms. Bennett concluded that the respondent's motives in pursuing visitation in January, 1997, and opposing the termination of his parental rights are not benevolent, but carry with them the potential of destructive intent. She concurred with Dr. Sacks's opinion that termination of the respondent's parental rights is imperative to ensure Samantha B.'s best emotional health and welfare. Ms. Bennett's study in behalf of the Department of Children and Families was entered into evidence as a full exhibit.
 ADJUDICATION Connecticut General Statute 45a-717(g) provides that a trial court may approve a petition terminating parental rights if the Court finds by clear and convincing evidence that termination is in the best interests of the child, and that over an extended period of time which shall not be less than one year, the parent has abandoned the child C.G.S. 45a-717 (g)(A), and/or there is no ongoing parent-child relationship. C.G.S. 45a-717 (g)(C).
Statutory abandonment is defined "the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." C.G.S. 45a-717(g)(A) No ongoing parent-child relationship is defined by C.G.S.45a-717 (g)(C) as "the relationship that ordinarily develops as a result of a parent having met on a continuing day-to-day basis the physical, emotional, moral and educational needs of the child, and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interest of the child."
I. Abandonment
Abandonment focuses on the parents' conduct. In re Drew R.47 Conn App. 124, 128 (1997), In re Juvenile Appeal 183 Conn. 11
(1981), In re Rayna M. 13 Conn. App. 23 (1987), In re Michael29 Conn. App. 112, 121 (1992). CT Page 10308
 "The commonly understood obligations of parenthood entail these minimum attributes: (1) express love and affection for the child;(2) express personal concern over the health and education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." In re Drew R., supra at 129.
The extent to which a parent is held to some or all of the listed obligations depends in large part on the particular circumstances and evidence in each case. In re Shannon S.41 Conn. Sup. 145, 151 (1989).
 "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts and financial support are indicia of in Teresa concern or responsibility for the welfare of a child. In re Luke 40 Con. Supp. 316, 323 (1985), In re Michael M. 29 Conn. App. 112, 121, (1992.
 "Where a parent fails to visit a child, fails to display love or affection for the child, has no personal interaction with the child and no concern for the child's welfare, statutory abandonment has occurred. In re Juvenile Appeal, 183 Conn. 11
(1981), In re Michael M., supra 121.
The statute does not contemplate a sporadic showing of the indicia of interest or concern for the child. The parent must maintain a reasonable degree of interest in the child's welfare which implies a continuing reasonable degree of concern. In reRayna M. 13 Conn. APP. 23, 37; In re Midaglia M, 6 Conn. APP. 194, 208, 209, cert.denied, 199 Conn. 809 (1986): In re Kezia M.,33 Conn. App. 23 (1987).
In the present case, the respondent initially showed interest in maintaining active involvement with Samantha B., despite resistance from the petitioner and her family. He was present at the birth, contributed a small sum of money and a gift for the child. When he was refused visitation, he promptly filed for visitation rights with the Court. A visitation with the child did occur in October, 1994 as a result of the respondent's Court action.
It is the ensuing period of time between October, 1994, and January, 1997, that troubles this Court. During this period of CT Page 10309 time the respondent failed to pursue his visitation, and failed to make himself available to Dr. Sacks for an evaluation. Although he was employed during parts of this time, he failed to make any effort to offer financial support to the child. While the respondent attributes his behavior to a lack of financial resources, he does admit that he spent sums of money for drugs, until his incarceration in July, 1996.
The respondent was no stranger to the Court system, and should have been aware that he could represent himself during child visitation proceedings. He was made aware of this possibility by the Guardian Ad Litem in January, 1995. He has admitted that his second action for visitation in January, 1997 was motivated by the fact that he could now get free legal assistance as an incarcerated prisoner.
The respondent admits that he made no further attempts to contact the minor child, as his phone calls were unsuccessful, and cards and letters were returned. Yet he cannot offer any specifics regarding his attempted phone calls, and he offers no physical evidence regarding returned letters and cards; especially during the period from January, 1995 through the date of the filing of this action for termination of his parental rights.
The respondent was incarcerated for a short time at the end of 1994, and from July, 1996 through the commencement of this trial. He was released in early 1998, while the trial was proceeding. However, his incarceration hardly complicates the issue. The incarceration of a parent does not alone constitute abandonment.. In re Juvenile Appeal, 187 Conn. 431, 443 (1982); Inre Shannon S. 41 Conn. Sup. 145, 153 (1989); In re JuvenileAppeal, 2 Conn. App. 705, 711 (1984) cert. denied, 195 Conn. 801
(1985).
 "Restrictions on movement that are inherent to incarceration however, do not excuse a failure to make use of available, albeit limited resources for communication with one's children." In re Juvenile Appeal, 187 Conn. 431 (1982).
After the respondent went to jail in July, 1996, his first documented expression of interest in Samantha B. was his filing of another visitation action in the Superior Court at Rockville in January, 1997. The respondent told Ms.Bennett of the D.C.F. that he had not filed previously because he did not want his CT Page 10310 daughter to know her father was in jail. However, he also admitted that he was now filing for visitation because free legal advice was available to him as a prisoner.
The Court finds that statutory abandonment by the respondent, as defined by C.G.S. 45a-717 (g)(A) has occurred, and has been proven by the petitioner by clear and convincing evidence. Further, this statutory ground has existed for not less than one year prior to the commencement of this action.
II. THERE IS NO ONGOING PARENT-CHILD RELATIONSHIP
By clear and convincing evidence the Court finds that there is no ongoing parent-child relationship existing between the child Samantha B. and the respondent Danny H.. Furthermore, to allow time for the establishment of a parent-child relationship would be detrimental to the best interests of the child.
The Court in reaching its conclusion has undertaken a two-pronged analysis. First, there must be a determination that there is no existing parent-child relationship, and second, the Court must determine whether it is detrimental to the child's best interest to allow time for such a relationship to develop. In reKezia M., 33 Conn. App. 12, 20, (1993) In re Juvenile Appeal, (Anonymous) 177 Conn. 648 (1979); In re Michael M.,29 Conn. App. 112 (1992); In re Megan M., 24 Conn. App. 338 (1991).
 "It is reasonable to read the language of no ongoing parent-child relationship to contemplate a situation in which regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them. . . . In re Juvenile Appeal, (Anonymous), 177 Conn. 648
(1979); In re Jessica M. 217 Conn. 459, 470 (1991).
In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. Inre Kezia M., 33 Conn. App. 12, 21 (1993); In re Michael M.29 Conn. App. 112 (1992).
The ultimate question is whether the child has no present memories or feelings for the natural parent, and if feelings any such feelings or memories do exist, are they of a positive Natrue only. In re Kezia M., supra 21; In re Jessica M., 217 Conn. 459,469 (1991). CT Page 10311
In the present case, the respondent has only seen the child on one occasion since her birth on February 25, 1994, and that was in October, 1994. Dr. Sacks noted that Samantha B. Is not aware of who her father is, and has no present or past memory, good or bad, of the respondent. She would not recognize him other than as a stranger. Dr. Sacks and Ms. Bennett, the D.C.F. social worker recommend that the respondent's introduction into the child's life would be confusing and harmful to the child. The respondent, himself, admitted that no ongoing parent-child relationship existed between himself and Samantha B..
To satisfy the second prong, as to whether it is detrimental to the child's best interest to allow for time for a parent-child relationship to develop, the Court has reviewed the testimony of the parties and other witnesses, as well as, the D.C.F. court-ordered study, and hereby concludes that it is not in the best interests of Samantha B. to allow time for the establishment of a parent child relationship with the respondent-father. The Court makes this finding by clear and convincing evidence.
The Court finds that the respondent lacks creditability in his sincerity to become an active and positive force in the child's life. The Court also relies on the recommendation of Dr. Sacks that the likelihood of harm is great if the respondent is allowed to enter the child's life at this date. Additionally, the respondent appears to continually blame others for his present plight, rather than accepting any responsibility himself, for the lack of contact with his child over the years. The respondent admits that the child would be confused by his entrance into her life.
The Court further finds that this ground for termination has existed for not less than one year prior to the filing of the termination of parental rights petition.
 DISPOSITION
Contested termination of parental rights trials consist of two distinct phases: the adjudication phase and the dispositional phase. Although the Court may hear evidence as to both adjudication and disposition during the course of the trial, it must first determine that the statutory grounds for termination have been proven, before it considers the issue of disposition. Conn.Practice Book Sec. 33-3 Revision 1998; In re Valerie D.223 Conn. 492, 511 (1992). CT Page 10312
Having determined in this case that the petitioner has met her burden of proof of clear and convincing evidence to both grounds for termination alleged in the petition, the Court now considers the issue of disposition.
Following the filing of the petition for termination of his parental rights in March, 1997, the respondent continued with his incarceration. During his incarceration, he attended and completed several substance programs offered through the Dept. of Corrections. Following his release from incarceration in early 1998, the respondent continued substance abuse treatment and counseling as part of his Court-ordered sanctions and conditions of his release. He hopes to become gainfully employed.
The petitioner is in the course of achieving her undergraduate degree and intends to seek a Master's degree. She continues to be gainfully employed while continuing her education. The petitioner is engaged to be married later in 1998. The D.C.F. social worker has interviewed the petitioner and her fiance, and confirms that they intend to pursue a step parent adoption of Samantha B. by the fiance once they are married, providing that the termination of the respondent's parental rights is granted.
Samantha B., as noted earlier, appears to be of above-average intelligence and developmentally sound. She considers her mother to be her only psychological parent, and she has been raised in a warm nurturing environment by the petitioner and her family members, who have provided for her emotional needs, material needs, educational and social needs. The Court notes that Dr. Sacks, who maintains significant professional credentials and the Dept. Of Children and Families concur that termination of the respondent's parental rights is in the best interests of Samantha B..
In deciding an appropriate disposition, the Court must consider whether or not the respondent's efforts in battling substance abuse, and his possible rehabilitation from involvement in criminal activity justify allowing him an opportunity to establish an ongoing parent-child relationship with Samantha B.. The Court concludes, in light of the past history in this case, and the respondent's behavior during the period between the child's birth and today, that it would be adverse to the best interests of the child not to terminate the parental rights of CT Page 10313 the respondent.
Before the Court may enter a judgment in this matter, it must make the following findings required by C.G.S. 45a-717(i):
1. Services Offered: Neither the D.C.F. or any other child-placing agency was involved in this action, and thus, no services were offered.
2. Reasonable efforts to Reunite: This was a private matter filed in the Shelton Probate Court and subsequently transferred to the Superior Court. Neither the D.C.F. or the Court issued any expectations for the respondent to comply with. The respondent was aware of his right to pursue visitation with his child through the Superior Court.
3. Court Orders: No Court orders were issued in this case, other than procedural orders to facilitate a speedy trial of the issues.
4. Feelings and Emotional Ties of the Child With Her Parents and Caretakers: Since her birth the child has resided continuously with her mother and the maternal grandparents. The child knows the mother as her sole parent, and is close to her maternal grandparents. The child has no present or past recollection of her father. She is not aware of his existence.
5. Age of the Child: The child was born on February 25, 1994 and is 4 years, six months old. The child has resided continuously with her mother and the mother's parents, and is closely bonded to them. The child does not know her father.
6. Personal Efforts to Rehabilitate and Reunify: The respondent-father has attempted to overcome his substance abuse problem through programs offered through the Dept. Of Corrections, and through outpatient treatment and counseling since his release from prison, earlier this year. It is premature to assess how successful he will be in remaining substance abuse free and free from involvement in the future with the criminal justice system. It is not in the child' s best interest to delay the permanency that a possible step parent adoption offers in order to allow the respondent time to reunify with the child in an attempt to establish an ongoing parent-child relationship.
7. Impediments to Maintaining a Meaningful Relationship: CT Page 10314 Evidence was introduced at trial that the respondent was initially prevented from visiting the child by the petitioner and her parents. The respondent recognized this and filed a court action for visitation, shortly after the child's birth. The Court did order visitation, and a visit did occur in October, 1994. However, subsequent to October, 1994, the respondent failed to maintain contact with the minor child for over two years to the date of the filing of the termination petition.
 JUDGMENT
Having considered the seven factors enumerated above, and having previously found as proven, the two grounds alleged by the petitioner for termination of the respondent's parental rights, it is further found by clear and convincing evidence that it is in the best interests of Samantha B. that the respondent, Danny H.'s parental rights be terminated.
Accordingly it is hereby ORDERED that the parental rights of the respondent-father be and are hereby terminated. It is FURTHERORDERED that the remaining parent Aubrey B. Be declared the sole parent, and unless otherwise provided by law, guardian of the person of the minor child Samantha B.
Entered at Bridgeport, Connecticut, this 5th day of September, 1998.
ARNOLD, J.